## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Yevgeny YURKOVETSKY; | ) | |
| Natalia D. YURKOVETSKY; | ) | |
| D.G.Y., a minor, | ) | |
| by and through his parent and guardian, | ) | CIVIL ACTION |
| Yevgeny YURKOVETSKY; | ) | NO._____ |
| M.A.Y., a minor, | ) | |
| by and through her parent and guardian, | ) | |
| Yevgeny YURKOVETSKY, | ) | |
| | ) | |
| **PLAINTIFFS** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | |
| US AIRWAYS, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## COMPLAINT

### NATURE OF ACTION

1. This is an action brought by Plaintiffs, Yevgeny YURKOVETSKY; Natalia D. YURKOVETSKY; D.G.Y, a minor, by and through his parent and guardian, Yevgeny YURKOVETSKY; and M.A.Y., a minor, by and through her parent and guardian, Yevgeny YURKOVETSKY, against Defendant US AIRWAYS, INC., to recover damages and compensation under 49 U.S.C. § 40101, et seq., and to recover compensatory and punitive damages and other monetary relief under the common law for

1

wrongful unreasonable, arbitrary, and capricious exclusion from flight, intentional infliction of emotional distress, and conversion.

## PARTIES

2.  The Plaintiffs Yevgeny YURKOVETSKY; Natalia YURKOVETSKY; D.G.Y., year of birth 1999, a minor, by and through his parent and guardian, Yevgeny YURKOVETSKY; and M.A.Y., year of birth 2006, a minor, by and through her parent and guardian, Yevgeny YURKOVETSKY, are residents of the town of Winchester, Middlesex County, Massachusetts, and citizens of the United States.

3.  The Defendant US AIRWAYS, INC. is a Delaware corporation conducting business and maintaining offices in Massachusetts.

## JURISDICTION

4.  This honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, federal question jurisdiction.

## STATEMENT OF FACTS

5.  On January 2nd, 2011, around 9:20 a.m., at Charlotte Douglas International Airport, holding boarding passes and a confirmed reservation (Exhibit 1), Plaintiffs boarded Defendant US Airways flight 1800, bound for Boston, approximately 25 minutes before the scheduled takeoff time of 9:45 a.m.

2

6.  Upon reaching their seats in row 23 of the aircraft, Plaintiffs found out that no overhead bin room was available in the vicinity of Plaintiffs' seats for their carry-on luggage consisting of two small backpacks and their coats.

7.  Because the overhead bins were closed, Plaintiffs asked the flight attendant present in the area for help locating space for their items.  The flight attendant rudely refused to help Plaintiffs, stating that helping passengers with their carry-ons was not her responsibility.

8.  After Plaintiff Natalia Yurkovetsky objected to the rude tone of the flight attendant's voice and her overall unprofessional conduct, the flight attendant proceeded to tell her, "Lady, if you want to fly today, take your seat and be quiet."

9.  Upon hearing that, Plaintiff Natalia Yurkovetsky replied saying, "You shouldn't be the one telling me to be quiet.  If you are not doing your job then I surely can say whatever I want."  The flight attendant then replied, "Then I can say whatever I want, too" and picked up the telephone, presumably to call the Captain.

10. At this point, Plaintiff Yevgeny Yurkovetsky approached the flight attendant and politely inquired about the flight attendant's name with the intent of filing a complaint with Defendant US Airways' Customer Service at a later time.  Holding the telephone, the flight attendant refused to identify herself and turned away from Plaintiff Yevgeny Yurkovetsky.

11. Plaintiffs proceeded to stow away their belongings in the overhead bins that were still open, in different areas of the aircraft neither immediately adjacent nor convenient to Plaintiffs' assigned seats.

12. While the rest of Plaintiffs were settling into their seats, Plaintiff Yevgeny Yurkovetsky approached the flight attendant again—seeing that she had completed her telephone

conversation—and politely restated his request for the flight attendant's name. The flight attendant responded with the words, "The agent is coming to deal with you." Plaintiff Yevgeny Yurkovetsky then took his seat and fastened his seatbelt.

13. In approximately ten minutes, after all Plaintiffs had been seated with their seatbelts fastened and all their items had been properly stowed away, another employee of Defendant US Airways, presumably the gate agent, approached Plaintiffs and requested that Plaintiffs collect their belongings and deplane.

14. Upon hearing the gate agent's request, Plaintiffs stated that they had done nothing wrong and refused to leave, expecting that the Captain or another figure of authority would intervene and—at the very least—hear their side of the story.

15. After Plaintiffs stated that they were not deplaning, the gate agent responded saying, "I give you one more chance to deplane voluntarily before the police gets involved and removes you." Plaintiffs again refused to deplane, thinking that even should the police get involved they would hear Plaintiffs out, understand that Plaintiffs had done absolutely nothing wrong, and allow them to travel on their scheduled flight. The gate agent left Plaintiffs' side.

16. In about five minutes' time, the Captain made a public announcement saying, "Some of the people onboard will not be traveling to Boston with us this morning and we are waiting for law enforcement officers to remove them from the plane."

17. Upon hearing this announcement, Plaintiffs stood up, collected their carry-on luggage and coats and proceeded to exit the plane. At the same time, two police officers and an armed member of the National Guard entered the aircraft. The law enforcement officials met Plaintiffs halfway through the economy class cabin and escorted them off the plane.

18. The flight Captain, or another senior flight crew member, stood in the doorway of the cockpit looking at Plaintiffs while they were deplaning without saying anything.

19. Plaintiff M.A.Y., four years old, began to cry loudly as soon as she saw the uniformed officials and continued crying for some time after being deplaned.

20. Once off the plane and back at the gate, Plaintiffs requested that Defendant US Airways' representatives present at the scene discuss with them what had just happened. The representatives replied to that saying, "If any of you continue talking you will be removed from the concourse." One of the police officers present advised Plaintiff Yevgeny Yurkovetsky to stop protesting and let Defendant US Airways' representatives issue Plaintiffs boarding passes for a later flight to Boston.

21. Plaintiffs were then issued a set of boarding passes (Exhibit 2) for Defendant US Airways flight 1822, scheduled to depart Charlotte Airport at 11:45 a.m.

22. These new boarding passes were not immediately given to Plaintiffs. The gate agent kept the passes after telling Plaintiffs that they would remain "under observation" for the remainder of their stay at the airport.

23. Shortly before Plaintiffs boarded flight 1822, the gate agent who removed them from flight 1800 approached Plaintiff Yevgeny Yurkovetsky, gave him the boarding passes for flight 1822, and stated that, "These days crew members wield enormous power and can remove any passengers if they don't feel comfortable flying with them."

24. Plaintiffs eventually left Charlotte on flight 1822 and arrived at Boston Logan Airport at 2:00 p.m. without incident.

25. On January 3rd, 2011, Plaintiffs sent a letter to Defendant US Airways CEO Douglas Parker, detailing their experience and urging internal investigation into the incident (Exhibit 3).

26. On January 6th, 2011, Plaintiffs filed a complaint with the Department of Transportation (DOT) and received a confirmation by return email (Exhibit 4).

27. On February 4th, 2011, Plaintiffs received a reply to their letter to the CEO of Defendant US Airways and their complaint to the DOT.  This reply email came from Ms. Roberta Swaggerty, a DOT Liaison employee of Defendant US Airways (Exhibit 5).  In her letter, Ms. Swaggerty stated that the gate agent intended to deplane Plaintiffs in order to "resolve the situation," and that it was Plaintiffs' refusal to leave the plane that then led to the need for police officers to be called in order to deplane Plaintiffs.

### FIRST CAUSE OF ACTION

(Wrongful Exclusion from Flight)

28. Defendant US Airways' decision to exclude Plaintiffs from flight 1800 was wrongful in that it was not reasonable but, on the contrary, arbitrary and capricious.

29. In the absence of statute, common carriers such as airlines have the duty "to secure the utmost care and diligence in the performance of their duties," which means "in regard to passengers,. . . the highest degree of carefulness and diligence." (*Liverpool & G.W. Steam Co.* v. *Phenix Ins. Co.*, 129 U.S. 397, 440 (1889), quotation in *Eid* v. *Alaska Airlines* (9th Cir. - July 30, 2010)).  When it comes to ejecting passengers from flights, that duty has been modified by federal law; under 49 U.S.C. § 44902(b), "an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier

decides is, or might be, inimical to safety." In the case of domestic flights, 49 U.S.C. §
44902(b) grants air carriers immunity if they act reasonably in excluding passengers from
a flight (*Newman* v. *Am. Airlines, Inc.*, 176 F.3d 1128 (9th Cir. 1999); *Cordero* v. *Cia
Mexicana De Aviacion, S.A.*, 681 F.2d 669 (9th Cir. 1982); these and other legal
precedents have also established that a private right of action exists under 49 U.S.C. §
44902(b) and other statutes addressing a variety of denied passage situations, e.g.
"bumping," racial discrimination, etc.).   *Cordero,* interpreting section 44902(b)'s
predecessor, held that airlines must act reasonably in refusing passage. More specifically,
*Cordero* held that airlines could be found acting unreasonably in excluding passengers
without even the most cursory inquiry into complaints against them. The interpretation
that airlines must act reasonably in refusing passage was reaffirmed seventeen years later
by *Newman,* which also held that "the decision to refuse passage cannot be unreasonable
or irrational." (176 F.3d at 1131 (citing *Cordero,* 681 F.2d at 671)).   An "arbitrary or
capricious" standard for judging the behavior of airline crews who bar passengers from
flying on domestic flights was also adopted by the First Circuit in *Cerqueira* v. *American
Airlines, Inc.,* 520 F.3d 1 (1st Cir. 2008).

30. That Defendant US Airways' decision to exclude Plaintiffs from flight 1800 was not
reasonable but instead wholly arbitrary and capricious is supported by the facts of the
case. Plaintiffs never made any threatening or intimidating remarks or gestures towards
the flight attendant or any other crew member or passenger; nothing in Plaintiffs' actions
or demeanor could possibly suggest that they somehow would present a safety risk during
the flight or interfere with any crew member's duties. The only issue that Plaintiffs

wanted to see resolved was for them to collect information for filing a complaint with Defendant US Airways' Customer Service about the rude and unhelpful flight attendant.

31. The decision to remove Plaintiffs from flight 1800 was taken without the slightest attempt by any of Defendant's employees to make even the most cursory inquiry into the nature of the conflict between Plaintiffs and the flight attendant. Had the Captain or the gate agent asked Plaintiffs a simple question, they would have gotten a simple answer thus immediately ascertaining that Plaintiffs, while posing no safety risk whatsoever, nevertheless had a legitimate grievance caused by the unprofessional and disrespectful conduct of the flight attendant. It is clear that the Captain's and/or the gate agent's decision to exclude Plaintiffs from their original flight was taken not in order to address any safety concern but instead with the goal of appeasing and/or placating the flight attendant who had chosen to adopt a hostile and unhelpful stance towards Plaintiffs.

32. It is peculiar, as well as remarkable, that following Plaintiffs' removal from flight 1800, Defendant US Airways chose not only to forego any formal or informal investigation of the presumed complaint of the flight attendant against Plaintiffs but in fact seemed very eager to avoid any discussion altogether by demanding that Plaintiffs keep quiet and even threatening them with expulsion from the concourse should Plaintiffs attempt to speak. This behavior indicates that Defendant US Airways' employees were fully aware that Plaintiffs at no time had posed any safety risk on flight 1800. Furthermore, the demeanor of Defendant US Airways' representatives at times suggested a certain degree of embarrassment for putting Plaintiffs, a family of upstanding and law-abiding citizens, through the humiliating ordeal of being publicly removed from their flight.

33. It is also of note that, according to Ms. Swaggerty's letter (Exhibit 5), Defendant US Airways appears to be routinely engaging in what seems to be a widespread practice of wrongful exclusion of passengers from their flights as it seems to follow an unlawful policy of deplaning passengers in order to "resolve situations." This malicious practice appears to serve as punishment meted out to "difficult" passengers, and, more broadly, as a tool for bullying traveling public at large into submission, while simultaneously promoting a corporate culture of irresponsibility, unaccountability and, ultimately, incompetence of crew members, gate agents, customer service representatives, etc., thereby in the long run not diminishing but in fact aggravating potential safety and security risks.

34. By its wanton, premeditated and malicious violation of federal law, Defendant US Airways knowingly, intentionally, and purposely put Plaintiffs through a humiliating ordeal of being ejected from an airplane full of passengers. Defendant's outrageous actions offended universally accepted standards of decency and morality. As a result, Defendant caused each of Plaintiffs to suffer serious damages.

35. Defendant US Airways owes Plaintiffs, and each of them, general damages in the amount of $5,000 each, punitive damages of $15,000 each, costs, expenses, and attorney's fees.


## SECOND CAUSE OF ACTION

(Intentional Infliction of Emotional Distress)

36. By its unlawful removal of Plaintiffs from their flight, and wrongful, outrageous, intolerable conduct that offended generally accepted standards of decency and morality, defendant US Airways intentionally and purposely inflicted emotional distress on

Plaintiffs, and each of them, and knowingly caused them each to suffer severe emotional distress and damages.

37. As a direct result of Defendant US Airways' wrongful actions, Plaintiff Yevgeny Yurkovetsky has been diagnosed as suffering from Post-Traumatic Stress Disorder, requiring medication, and is currently undergoing a course of psychotherapy.

38. Plaintiff Natalia D. Yurkovetsky has suffered significant mental and emotional distress as a consequence of the incident.

39. Plaintiff D.G.Y, 11 years old at the time of the incident, has been repeatedly ruminating over the traumatizing experience, time and again wanting to discuss the incident with his family as well as to share the story with his teachers, classmates, acquaintances, etc. This pattern of behavior is especially troubling in light of the fact that Plaintiff D.G.Y. is an autistic child with special education needs. It remains to be seen whether and exactly how Plaintiff D.G.Y. is going to suffer and—it is hoped—eventually recover from this traumatizing experience.

40. Plaintiff M.A.Y., 4 years old at the time of the incident, has developed a fear of uniformed personnel, including airline pilots, police officers, firefighters, members of the armed forces, etc. She keeps referring to the incident as "the time we got in trouble on the plane" and often cries when she thinks that police is going to arrest her parents (for example, whenever she sees a traffic patrol car on a roadway).

41. Defendant US Airways owes Plaintiffs, and each of them, general damages in the amount of $5,000 each, punitive damages of $15,000 each, costs, expenses, and attorney's fees.

## THIRD CAUSE OF ACTION

### (Conversion)

42. Defendant US Airways, having unlawfully denied Plaintiffs their originally scheduled passage to Boston, failed to ensure that Plaintiffs arrived at Boston Logan Airport within one hour of their original arrival time.

43. Pursuant to Section 10.4(B), p.20, of Defendant US Airways' Contract for Carriage, rev. 13, 10/29/2010, (Exhibit 6) Defendant US Airways was obligated to reimburse the cash equivalent of Plaintiffs' Charlotte to Boston fare, in the amount of $101.30 each.

44. Defendant US Airways wrongfully converted the referenced sums to its own use and deprived Plaintiffs, and each of them, the value thereof.

45. Defendant US Airways owes Plaintiffs $101.30 each, plus treble punitive damages of $303.90 each, interest, costs, and attorney's fees.

## REQUEST FOR RELIEF

46. WHEREFORE, Plaintiffs Yevgeny YURKOVETSKY; Natalia YURKOVETSKY; D.G.Y, a minor, by and through his parent and guardian, Yevgeny YURKOVETSKY; and M.A.Y., a minor, by and through her parent and guardian, Yevgeny YURKOVETSKY, demand and request that judgment be entered in their favor against Defendant US Airways as follows:

47. On the First and Second Causes of Action, for wrongful exclusion from flight and intentional infliction of emotional distress, for total general damages of $40,000 and

punitive damages of $120,000, plus interest, costs, expenses, attorney's fees, and all other relief that this honorable Court may find just and proper.

48. On the Third Cause of Action, for conversion, for contractual damages of $405.20 and punitive damages of $1,215.60, plus interest, costs, expenses, attorney's fees, and all other relief that this honorable Court may find just and proper.

49. Plaintiffs demand a trial by jury.

Respectfully submitted,

Yevgeny Yurkovetsky, Pro Se

Natalia Yurkovetsky, Pro Se

97 Lawson Road

Winchester, MA 01890

Telephone: 646-691-0142

email: yurkovetsky@gmail.com

12